IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| JAMES L. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:11-CV-019 |
| | ) | |
| STEUBEN COUNTY, INDIANA, | ) | |
| RICHARD L. LEWIS, in his individual | ) | |
| and official capacities as Sheriff of Steuben | ) | |
| County, Indiana, and DOUGLAS GRANDIN, | ) | |
| BEN RASEY, DAN BROWN and ADAM | ) | |
| KITSON in their individual and official | ) | |
| Capacities as law enforcement officers at the | ) | |
| Steuben County, Indiana, Sheriff's Office, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff James L. White brings this 42 U.S.C. § 1983 action against Defendants, Steuben County, Indiana, Richard L. Lewis, Douglas Grandin, Ben Rasey, Dan Brown, and Adam Kitson, alleging that Defendants violated his procedural due process rights when they removed him from his work release program without first affording him a hearing and that this removal constituted false imprisonment and intentional infliction of emotional distress under Indiana state law.[1]  On July 25, 2011, Defendants moved for summary judgment on all of White's claims. (Docket # 22.)  White filed his response in opposition on August 29, 2011 (Docket # 26), and Defendants replied on September 12, 2011 (Docket # 29); the motion is now ripe for ruling.  For

_____

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.  (Docket # 18.)

the reasons set out below, the Court will GRANT Defendants' Motion for Summary Judgment as to all claims.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

On October 10, 2008, White pled guilty to involuntary manslaughter in Steuben Superior Court.  (White Dep. 13, Ex. A.)  In the Judgment of Conviction, Sentence, and Commitment Order Upon Guilty Plea, Judge William C. Fee sentenced White to 1,095 days imprisonment, with 545 days suspended.[3]  (White Dep. Ex. A.)  The executed sentence was to be served by 550 days in jail, with the final 180 allowed to be served in Community Corrections.  (White Dep. Ex. A.)  In the Judgment of Conviction, Judge Fee noted that White was recommended for work release and further ordered that:

> Any work release/weekend sentencing, suspended sentence or continued probation inherent in this cause, shall be conditioned on the defendant's obedience of the rules of the Steuben County Work Release Program.  Any violation of these rules shall authorize the Sheriff to immediately remove the defendant from work release and continue to hold the defendant in the Steuben County Jail for the completion of this commitment order, according to the terms and conditions of the Steuben County Work Release Program Rules and Handbook.  Further, any violation of work release rules shall constitute grounds, after hearing in court, to execute any remaining suspended sentence and revoke any continuing probation.

(White Dep. Ex. A.)  White was accepted into the Steuben County Work Release Program ("Work Release") at the discretion of Richard Lewis, the then Sheriff of Steuben County.  (Lewis Aff. ¶¶ 2, 6.)  White's participation in the program began on November 22, 2008.  (White

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to White, the nonmoving party.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

[3] According to the deposition of Steuben County Lieutenant Ben Rasey and a letter he sent to Judge Fee after White was removed from Work Release, White was sentenced to the Department of Corrections, with alternative sentencing authorized.  White attempted to serve his sentence with Allen County's Work Release or Community Corrections programs, but was not admitted.  He was then accepted into the Steuben County Work Release Program.  (Rasey Dep. 38-39, 59-61, Ex. 5.)

Dep. 22.)  Steuben County's Work Release was not a Community Corrections program (Lewis Aff. ¶ 4; Rasey Dep. 64); rather, it was authorized by the State of Indiana under the direction of the Steuben County Sheriff and managed by the Steuben County Work Release Supervisor (White Dep. Ex. C, at 1).  At least at the start, Work Release inmates were housed in the Work Release Center ("Center"), which was separate from the jail.  (White Dep. 16.)

The Steuben County Work Release Handbook ("Handbook") sets forth a number of rules and procedures that inmates must follow.[4]  (White Dep. Ex. C.)  As White testified and the Handbook provides, while in the Center, inmates could not wear any outside clothing, but were required to wear a uniform of a certain colored sweat suit—grey for men and navy for women—and shoes without laces, such as flip fops or shower shoes.[5]  (White Dep. 20, 24, Ex. C, at 4-5, 8.)  Furthermore, inmates were required to be at the Center at all times, except when they were out working or using their once per week six hour pass.  (White Dep. 26.)  Whenever they left, inmates had to sign in and out of the Center and notify a Work Release officer of their return time.  (White Dep. 20, Ex. C, at 4.)  Inmates were provided only the time necessary to reach their employment and were accountable for all time away from the Center, such that their hours of pay must match their hours outside the Center.  (White Dep. Ex C, at 4.)  If an inmate failed to return at his appointed time, he would be placed on escapee status and face criminal escape charges. (White Dep. Ex. C, at 4.)  While White was an inmate in the Center, he slept on a cot in a ten-by-ten foot room with two other people and was only allowed to bring in toiletries, which he kept in

---

[4]White admitted that he received a "Steuben County Work Release Handbook," but did not believe the one presented at his deposition was the one that he received.  (White Dep. 17.)  Regardless, White acknowledged many of the rules and procedures set out in the Handbook.

[5]The Handbook refers to this as the "standard jail uniform."  (White Dep. Ex. C, at 5.)

a plastic tote under his bed; his work clothes and other permitted items were stored in a work locker, which was subject to inspection and could only be accessed by requesting the key from an officer.  (White Dep. 23-24, Ex. C, at 4.)  There were common shower facilities, a common area with a television, and vending machines, from which inmates had to purchase their meals while at the Center.  (White Dep. 25, Ex. C, at 10.)  The Center was staffed twenty-four hours a day, and inmates were subject to either a pat or strip search each time they entered.  (White Dep. 25, Ex. C, at 8.)  Inmates were also randomly tested for drugs or alcohol.  (White Dep. Ex. C, at 12.)

As for employment, the Work Release Supervisor had to approve all employment, with the Sheriff having final approval.  (White Dep. Ex. C, at 1.)  Inmates were not allowed to be self-employed or work from their homes.  (Grandin Dep. 5-7; Rasey Dep. 12.)  Moreover, inmates could not work more than fourteen hours in one day or seventy-eight hours in one week and were required to receive documented pay because they also had to defray the costs of their Work Release.  (White Dep. Ex. C at 1; Rasey Dep. 12-13.)  Termination from employment was grounds for loss of the work release privilege.  (White Dep. Ex. C, at 1.)

When White began Work Release, he was employed as an insurance agent for Premier Marketing Group.  (White Dep. 27.)  On December 30, 2008,[6] White changed jobs after he and his former business partner, Thomas Julius—White's supervisor at Premier Marketing Group—decided not to work together anymore.  (White Dep. 30-31.)  That night, White filled out an inmate request form noting that he had changed jobs and was now employed by PMG Agency, MI, Inc.  (White Dep. 31, Ex. D.)

_____

[6]Although immaterial to the issues before the Court, there is some discrepancy concerning precisely when White changed jobs.

4

On January 22, 2009, Captain Douglas Grandin of the Steuben County Sheriff's Department received a phone call from Julius, stating that White had been terminated from Julius's employment "during the Christmas holiday area," and "on or around December 30, 2008."[7]  (Grandin Dep. 3-4.)  Captain Grandin referred the matter to Lieutenant Ben Rasey for a follow-up investigation.  (Grandin Dep. 4.)  Lt. Rasey's investigation suggested that White had violated several Work Release Rules, including false reporting of his work hours,[8] termination from employment,[9] unauthorized change in employment,[10] and employment that failed to qualify under Work Release Guidelines.[11]  (White Dep. Ex. D.)

Because of these alleged "major" violations of the Handbook, White was removed from Work Release and transferred to the Steuben County Jail ("Jail") on January 22, 2009.  (White Dep. 32.)  At that time, White received a conduct report listing his alleged violations of Work Release.[12]  (White Dep. 32-34, Ex. D, at 1.)  White was booked into the Jail, taken to a holding

---

[7]The report of Lieutenant Rasey, to whom Captain Grandin referred Julius's information for follow-up, gives the date of "on or around December 30, 2008" for White's termination.  (Grandin Dep. 3.)  However, Captain Grandin testified that Julius did not give him an exact date, indicating only that it was "during the Christmas holiday area."  (Grandin Dep. 3.)  It is unclear where Lt. Rasey got the date of December 30th.

[8]According to Lt. Rasey, internal records show that White claimed to work December 29, 2008, for eleven and a half hours, but he was not compensated for that day and Julius claimed it was because White was not supposed to be working on the 29th.  (Rasey Dep. 24; White Dep. Ex. G, at 2.)  Lt. Rasey further testified that White would claim to be working twelve to fourteen hours per day and on weekends, but that his pay would come out to less than minimum wage.  (Rasey Dep. 97; *see* White Dep. Ex. 6, at 2.)

[9]While Lt. Rasey recognized that White had informed Work Release of his change in employment, Lt. Rasey believed that White had not informed the program that he had been *terminated*.  (White Dep. Ex. G, at 2.)

[10]Lt. Rasey testified that the correct procedure before changing jobs is to get prior approval from Work Release staff.  (Rasey Dep. 18, 20.)

[11]Lt. Rasey's understanding was that, at PMG Agency, MI, Inc., White was self-employed and working from his residence, which is not acceptable employment.  (Rasey Dep. 40, 43; White Dep. Ex. G, at 2.)

[12]In his deposition, White testified that the "top" form of Defendant's Exhibit D, the violation report, was handed to him on January 22, 2009, at the Center.  The form itself indicates that it was delivered to White on January 21, 2009.  Furthermore, the bottom of the form contains the findings of the Hearing Officers and was signed on

cell for approximately three days, and then placed in the general population cell block, where he shared an individual cell with one or more inmates and had access to an open area. (White Dep. 34-36.) On the morning of January 26, 2009, Officers Adam Kitson and Dan Brown took White from his cell and questioned him about his alleged violations. (White Dep. 38-40.) The Officers viewed White's answers as "deceptive" and found him guilty of the alleged offenses, resulting in the loss of 275 days of good time credit. (White Dep. Ex. G.) On February 18, 2009,[13] however, White was returned to Work Release and his good time credit was eventually restored. (White Dep. 47, 55.)

When White returned to Work Release, he continued to be housed in the Center until approximately June 2009, when the Center was closed and Work Release moved to the basement of the Steuben County Jail, where White and the other inmates were housed in a dormitory style setting. (White Dep. 48-50.) By July 2009, White transferred to the Allen County Work Release Program, where he completed his sentence. (White Dep. 51-53.)

On August 14, 2009, White filed a Notice of Tort Claim with Steuben County and the Steuben County Sheriff. (White Dep. 56, Ex. I.) On January 12, 2011, White then brought this suit against Defendants, alleging that when Defendants removed White from Work Release without a hearing, they violated his procedural due process rights under the Fifth and Fourteenth Amendment and Ind. Code § 35-38-2.6-5, falsely imprisoned him, and intentionally inflicted

---

January 26, 2009. Therefore, the 21st date was probably a mistake, and the form was most likely handed to White on the 22nd with only the top portion filled out.

[13]While White testified in his deposition that he returned to Work Release on February 18, 2009 (White Dep. 47), Plaintiff's Response to Defendants' Motion for Summary Judgment indicates that White returned on February 22, 2009 (Pl.'s Resp. 23). This discrepancy is seemingly only important as it relates to White's filing of his Notice of Tort Claims, and the four day difference does not affect that analysis.

emotional distress upon him.

In Defendants' Memorandum in Support of Motion for Summary Judgment, they argue that White's § 1983 claims fail because White did not have a constitutionally protected liberty interest in his continued participation in Work Release, and even if he did, Defendants would be entitled to qualified immunity. As for his state law claims, Defendants assert that White failed to timely file his Notice of Tort Claim, which is fatal to his state claims, and that, even if the Notice were timely filed, White's claims still fail because he cannot prove the elements of false imprisonment or intentional infliction of emotional distress.

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

7

## IV.  DISCUSSION

### A.  Section 1983 Claims[14]

To state a claim under § 1983, "a plaintiff must allege that the defendants deprived him

of a right secured by the Constitution or laws of the United States, and that the defendants acted

under color of state law."  *Lekas v. Briley*, 405 F.3d 602, 606 (7th Cir. 2005) (citations omitted).

Here, White alleges that Defendants deprived him of liberty without due process of law by

taking him into custody on January 22, 2009, and holding him there against his will; by failing to

instruct, supervise, and control the Sheriff Department's Officers and Jail employees; and by

refusing to comply with the applicable law for revocation of Work Release privileges. (Compl.

Counts I-II.)  When a plaintiff brings a § 1983 action for procedural due process violations, "an

essential component . . . is a protected property or liberty interest."  *Domka v. Portage Cnty.*, 523

F.3d 776, 779-80 (7th Cir. 2008).  A protected liberty interest can arise from two sources: the

Due Process Clause or state law.  *Weller v. Grant Cnty. Sheriff*, 75 F. Supp. 2d 927, 932 (N.D.

Ind. 1999); *see Domka*, 523 F.3d at 780 (citations omitted).  Because White did not have a

liberty interest under either the laws of Indiana or the Due Process Clause, the Court will

---

[14]In his Complaint, White alleges that he had a liberty interest in remaining in Work Release protected by the Due Process Clause and, further, that he was entitled to a due process hearing before his transfer from Work Release under Ind. Code § 35-38-2.6-5 and *Million v. State*, 646 N.E.2d 998 (Ind Ct. App. 1995).  In his Response to Defendants' Motion for Summary Judgment, however, White appears to have abandoned his original argument, asserting instead the meritless contention that his transfer from Work Release violated Judge Fee's sentencing order that, White claims, created a liberty interest under the vested rights doctrine.  Notably, the critical sentence of Judge Fee's order provides, "any violation of work release rules shall constitute grounds, after hearing in court, *to execute any remaining suspended sentence and revoke any continuing probation*."  (White Dep. Ex. A, at ¶ 6 (emphasis added).)  From the explicit terms of the order itself, a hearing in court is required only if any suspended sentence is to be executed or any period of probation revoked, none of which occurred in White's case.  More to the point, while in Work Release, White was not on probation or serving a suspended sentence; rather, he was serving the executed portion of his sentence.  Furthermore, when White was transferred from Work Release to the Steuben County Jail, he was still serving only the executed portion of his sentence and not any suspended portion.  Therefore, under Judge Fee's order, White was not entitled to a hearing.  Nevertheless, the Court will proceed to examine White's claims under the Due Process Clause and state law.

GRANT Defendants' summary judgment as to White's § 1983 claims.

### 1. *Liberty Interest Arising Under Indiana Statutory Law.*

White alleges that Ind. Code § 35-38-2.6-5 created a liberty interest that entitled him to a due process hearing in a court of law under *Million v. State*, 646 N.E.2d 998 (Ind. Ct. App. 1995), before Defendants could remove him from Work Release.  (Compl. ¶ 18.)  This statute, appearing in Chapter 2.6, "Direct Placement in Community Corrections Program," provides:

> Sec. 5 If a person who is placed under this chapter violates the terms of the placement, the court may, after a hearing, do any of the following:
> (1) Change the terms of placement.
> (2) Continue the placement.
> (3) Revoke the placement and commit the person to the department of correction for the remainder of the person's sentence.

IND. CODE § 35-38-2.6-5.  A defendant directly placed in community corrections under this statute is entitled to a series of procedural steps and a neutral hearing in front of the trial court before his placement can be revoked.  *Million*, 646 N.E.2d at 1002-1003.  The terms of the statute (indeed, the chapter title) make it clear that the statute applies only to direct placement in a community corrections program.  *See Weller*, 75 F. Supp. 2d at 932.  A "community corrections program" is defined as "a program consisting of residential and work release, electronic monitoring, day treatment, or day reporting that is: (1) operated under a community corrections plan of a county and funded at least in part by the state subsidy . . . or (2) operated by or under contract with a court or county."  IND. CODE § 35-38-2.6-2.

A further limit on the application of Ind. Code § 35-38-2.6-5 is the requirement that a defendant be *directly* placed in a community corrections program, which occurs when a defendant is ordered directly into a community corrections program at the time of sentencing in lieu of commitment to the department of correction.  *Paige v. Hudson*, 234 F. Supp. 2d 893, 900

(N.D. Ind. 2002), *aff'd*, 341 F.3d 642 (7th Cir. 2003) (citing IND. CODE § 35-38-2.6-1).  Based on the language of the statute and the direct placement requirement, the statute contemplates that the court that actually puts a defendant into a community corrections program is the only authority—with, of course, certain procedural safeguards—that can later remove the defendant or change the terms of his placement.

Moreover, in *Weller*, when the superior court judge had sentenced the plaintiff to the Indiana Department of Corrections and indicated that his sentence *could* "be served at the Grant County Jail with the defendant on work release, subject to the approval of the Grant County sheriff," the district court reviewing the plaintiff's § 1983 action found that "it can in no way be said that plaintiff was sentenced to serve his time in a community corrections program—indeed even his work release status was subject to the approval of the sheriff—such that he was entitled to the protections afforded in I.C. 35-38-2.6-5."  75 F. Supp. 2d at 932-33.  As for the procedural rights announced in *Million*, the defendant in that case had been directly placed in a community corrections program, 646 N.E.2d at 999, bringing him explicitly within the terms of the statute.

Here, Ind. Code § 35-38-2.6-5 is inapplicable to White's situation for two reasons.  First, White participated in the Steuben County Work Release Program, which, despite its name, was not devised as part of a Steuben County community corrections plan, but rather was a program that functioned solely under the authority and complete discretion of the Steuben County Sheriff. (Lewis Aff. ¶¶ 3-4.)  Moreover, as the statute makes clear, the procedural protections it describes apply only to individuals that are directly placed in a community corrections program by the sentencing court.  As Judge Fee's order reveals, however, he only recommended work release and it was solely the Sheriff's decision whether to place White there.  Accordingly, even if the

Steuben County Work Release Program *were* a community corrections program—which it unequivocally is not—the statute would still not apply to White because he was not sentenced *directly* to Work Release.

Furthermore, similar to the plaintiff in *Weller*, Judge Fee's sentencing order permitted White to participate in a county work release program—seperate from community corrections—run by and subject to the approval of the county sheriff, which does not entitle White to the protections of Ind. Code § 35-38-2.6-5.  *See Weller*, 75 F. Supp. 2d at 932-33. Judge Fee's order, in which he states that "[a]ny violation of these [Work Release] rules shall authorize the Sheriff to immediately remove the defendant from work release and continue to hold the defendant in the Steuben County Jail . . ." (White Dep. Ex. A), further confirms that White had no right to a hearing under state law and that Ind. Code § 35-38-2.6-5 is inapplicable.

### 2. *Liberty Interest Arising Under the Due Process Clause.*

In *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995), the United States Supreme Court held that, under certain circumstances, states may create liberty interests that are protected by the Due Process Clause, but limited these state-created interests to freedom from restraint that, "while not exceeding the sentence in an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  The Seventh Circuit Court of Appeals has interpreted this language as recognizing two sources for liberty interests arising under the Due Process Clause:  those created by states through statutes or regulations, which, under the *Sandin* doctrine, are limited to freedom from restraint which imposes an atypical and significant hardship on the inmate, and those that exist independently of state regulations, arising from the

11

Due Process Clause itself, which are limited to infringements that exceed the expected scope of the inmate's sentence. *Hamilton v. Peters*, 919 F. Supp. 1168, 1172 (N.D. Ill. 1996) (construing *Whitford v. Boglino*, 63 F.3d 527, 532 (7th Cir. 1995) (per curiam)).

While neither the Supreme Court nor the Seventh Circuit have directly addressed the question of whether an inmate has a protected liberty interest in continued participation in a work release program under the Due Process Clause, several district courts within the Seventh Circuit as well as other Courts of Appeals have concluded that inmates do not have a protected liberty interest. *Asquith v. Dep't of Corr.*, 186 F.3d 407, 411 (3d. Cir. 1999); *Callender v. Sioux City Residential Treatment Facility*, 88 F.3d 666, 668 (8th Cir. 1996); *Dominique v. Weld*, 73 F.3d 1156, 1161 (1st Cir. 1996); *Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir. 1995); *Whitehorn v. Harrelson*, 758 F.2d 1416, 1421 (11th Cir. 1985); *Hinton v. Wells*, No. 06-C-0543-C, 2006 WL 3192381, at *4 (W.D. Wis. Nov. 1, 2006); *Roy v. Domiguez*, No. 2:06-CV-300 PS, 2006 WL 2604606, at *1 (N.D. Ind. Sept. 8, 2006); *Weller*, 75 F. Supp. 2d at 934; *Hamilton*, 919 F. Supp. at 1172. Therefore, under the current case law within, and the majority trend outside of, the Seventh Circuit, White does not have a protected liberty interest in his continued participation in the work release program arising from either the Due Process Clause itself or state regulations.

### a. *Liberty Interest Arising Under the Due Process Clause Itself*

While recognizing the possibility of state-created liberty interests, *Sandin* also reaffirmed that the Due Process Clause itself confers a liberty interest in certain situations where the infringement exceeds the inmate's sentence in an unexpected manner. 515 U.S. at 479 n.4, 484. The Supreme Court has found liberty interests inherent in the Due Process Clause when a

12

prisoner is faced with an involuntary transfer to a mental hospital for treatment, *Vitek v. Jones*, 445 U.S. 480, 493-94 (1980), or threatened with the forced administration of psychotropic drugs, *Washington v. Harper*, 494 U.S. 210, 221-222 (1990).

Beyond these mental health situations, the Supreme Court has treated those prisoners remaining in institutional confinement differently than those who have been released from incarceration.  For instance, a prisoner still in institutional confinement does not have a liberty interest inherent in the Due Process Clause in remaining in a preferred facility within a state's prison system, *Meachum v. Fano*, 427 U.S. 215, 225 (1976), or in avoiding temporary placement in solitary confinement, *Sandin*, 515 U.S. at 487.  Relying on *Meachum*, the Seventh Circuit has also held that "a transfer to another prison, even to one with a more restrictive environment, is not a further deprivation of an inmate's liberty under the Due Process Clause itself because the prisoner could have been initially placed in a more restrictive institution, so a transfer does not fall outside the expected scope of the sentence."  *Whitford*, 63 F.3d at 532.  Accordingly, an inmate does not have an inherent liberty interest in avoiding a disciplinary transfer from a work release facility to a more secure facility.  *Hamilton*, 919 F. Supp. at 1172; *see Roy*, 2006 WL 2604606, at *1 (holding, without much analysis, that there is no constitutional liberty or property interest in participation in a work release program, that a jail does not need a reason to relocate a convicted inmate, and that a prisoner is entitled to no due process before he is relocated).

On the other hand, the Supreme Court has found protected liberty interests inherent in the Due Process Clause after an inmate is released from institutional confinement.  *See Young v. Harper*, 520 U.S. 143, 147 (1997) (concluding that there is a liberty interest in pre-parole that is equivalent to parole); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (finding an inherent liberty

interest in probation); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (finding an inherent liberty interest in parole).

The Seventh Circuit has also alluded to the important distinction between a prisoner and a former prisoner released from confinement.  In holding that the removal of a probationer from a home-detention program into jail was a sufficiently large incremental reduction in freedom to be classified as a deprivation of liberty under the *Sandin* doctrine, the Seventh Circuit stated, "[t]he difference between being confined in a jail and being confined to one's home is much greater than the difference between being a member of the general prison population and an inmate of the prison's segregation wing."  *Paige v. Hudson*, 341 F.3d 642, 643-44 (7th Cir. 2003).  In *Domka*, the Seventh Circuit analyzed *Paige* but declined to answer the question of whether a prisoner—as opposed to a probationer, parolee, or pre-parolee—has a liberty interest in a home detention program.  523 F.3d at 781.  Therefore, a prisoner's liberty interest in a home detention or similar program is significantly different from that of a probationer, who has already been released from institutional confinement.  As such, "the dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest [is] the fact of release from incarceration."  *Paige*, 234 F. Supp. 2d at 901 (quoting *Harper v. Young*, 64 F.3d 563, 566 (10th Cir. 1995), *aff'd*, 520 U.S. 143 (1997)); *accord Weller*, 75 F. Supp. 2d at 934 (quoting same).

When determining whether an inmate has been released from incarceration or institutional confinement, courts consider where the inmate is housed; the restrictions on his freedom, movement, and employment; and his overall ability to live a life without the incidents of imprisonment.  For instance, in expanding the category of inherent liberty interests to include

14

pre-parole in *Young*, the Supreme Court focused on the nature of the parolee's liberty interest in

his continued freedom as set out in *Morrissey*, namely that

> he can be gainfully employed and is free to be with family and friends and to form
> the other enduring attachments of normal life.  Though the State properly subjects
> him to many restrictions not applicable to other citizens, his condition is very
> different from that of confinement in prison . . . .

*Young*, 520 U.S. at 147-48 (quoting *Morrissey*, 408 U.S. at 482).  Like a parolee, the pre-parolee

in *Young* was allowed to keep his own residence, obtain employment, and "live[ ] a life generally

free of the incidents of imprisonment."  *Id.* at 148.  As such, the Supreme Court found that pre-

parole was more similar to parole than minimum security imprisonment, which, under *Sandin*,

inmates do not have a liberty interest in remaining, and that, therefore, continued participation in

pre-parole was protected by the Due Process Clause itself.  *Id.* at 147.  Similarly, in *Domka*, the

Seventh Circuit agreed that "between the constant electronic monitoring and the fact that he was

not allowed to leave his home except to go to work or for other pre-approved reasons, the

frequent Sobrietor tests, etc., Domka can appropriately be characterized as a prisoner 'serving a

portion of [his] confinement in a different location [from prison].'"  523 F.3d at 781 n.3.

      Other Courts of Appeals have considered whether work release is more analogous to

institutional life than to probation or parole, *Callender*, 88 F.3d at 668, and look at the similar

factors in reaching that conclusion, *see Asquith*, 186 F.3d at 411.  In *Asquith*, the Third Circuit

recognized that a prisoner living in a halfway house had more liberty than when in prison,

including the ability to leave the halfway house for work and to obtain passes to visit family,

shop, eat at restaurants, or go to the local YMCA.  Nonetheless, the Third Circuit concluded that

the prisoner never left institutional confinement because, rather than living in his own home, he

lived in a strictly monitored halfway house where he was subject to a curfew and had to "stand

count" several times a day, was required to submit to urine monitoring and searches of his room,

had to sign in and out, had only two passes per week, had his traveling time monitored, and was

required to check in by phone several times each day when he was away.  186 F.3d at 411.  If he

could not be contacted within two hours, the inmate would be deemed an escapee.  *Id.*

Two Northern District of Indiana cases further draw a distinction between institutional

confinement and release from incarceration.  In *Weller*, the court held that when a prisoner "is in

a work release program at the discretion of the sheriff and is required to reside at the jail at the

times when he is not at work, he has no liberty interest in remaining in such a program such that

due process requires an opportunity to be heard prior to his removal from the program, at least to

the extent that such a removal does not have an impact on the length of his incarceration."  75 F.

Supp. 2d at 935.  On the other hand, in *Paige*, the same court determined that because the

probationer participated in a home detention program as a condition of probation and was

permitted, with restrictions, to live and work outside of prison walls, the probationer seemingly

had a liberty interest in his continued participation in the program.  234 F. Supp. 2d at 902.

In coming to these different conclusions, the court relied on the language from *Morrissey*

as well as the prisoner's freedom to live in his own home without immediate supervision, stating

that "[t]he liberty associated with a life outside the walls of a penal facility dwarfs that available

to an inmate.  It is the freedom to 'be gainfully employed,' 'to be with family and friends,' and

'to form the other enduring attachments of normal life.' . . . It is the ability to reside in a home of

one's own without bars or fences or bonds, beyond the immediate authority of guards or

wardens."  *Paige*, 234 F. Supp. 2d at 902 (quoting *Harper*, 64 F.3d at 566, *aff'd*, 520 U.S. 143

(1997)) (internal citations omitted).  Therefore, the important factors in determining whether an

16

inmate is institutionally confined such that he does not have a protected liberty interest in a work release program is whether the inmate, no matter the label given to his status, was released from institutional confinement, was allowed to reside in his own home, was free to be with family and friends, could maintain employment, and could generally live without the incidents of imprisonment, such as constant monitoring and pervasive restrictions.

In the instant case, the terms, restrictions, and nature of White's participation in Work Release are such that White does not have a liberty interest in his continued participation in the program arising from the Due Process Clause itself. Critically, White was not on probation, parole, or pre-parole, but rather was serving out the executed portion of his sentence in Work Release. As the Seventh Circuit implicitly recognized, an inmate's liberty interest in a home detention or work release program is different from that of a probationer, who has already been released from incarceration. *See Domka*, 523 F.3d at 781 n.3. Therefore, the dispositive question is whether White's participation in a work release program amounted to a release from incarceration or merely to institutional confinement in a different location than prison.

A major factor in this analysis is where the inmate is housed. While, during his initial participation in Work Release, White was housed in a separate facility from the jail, he was not permitted to live in his own residence. In fact, even working from his own residence could result in a violation of Work Release rules. This puts White somewhere between the prisoner in *Weller*, a work release participant housed in the jail itself, and the probationer in *Paige*, who was allowed to live and work outside of prison walls. Looking at the often quoted language from *Morrissey*, although White could be "gainfully employed" and go out into the community, there were restrictions on his employment, such as not being self-employed and limits on the number

17

of hours he could work.  Moreover, he was not "free to be with family and friends" or "to form

the other enduring attachments of normal life."  *Morrissey*, 402 U.S. at 482.  Instead, White was

only allowed to leave the Center for work and had one six hour pass per week that he could use,

which is even less than the prisoner in *Asquith*, where the Third Circuit found the inmate did not

have a protected liberty interest in a work release program that required him to live in a halfway

house.  186 F.3d at 411.

Furthermore, White could not "live[ ] a life generally free of the incidents of

imprisonment."  *Young*, 520 U.S. at 148.   Rather, he was constantly monitored both at the

Center and while working.  The Center was staffed twenty four hours a day, and White had to

sign in and out of the Center every time he left for work, was only provided the time necessary to

reach his employment, and would be deemed an escapee if he failed to return at the reported

time, just as in *Asquith*.  186 F.3d at 411.  Rather than living in a "strictly monitored halfway

house" as the *Asquith* inmate did, White lived in a strictly monitored facility with other work

release inmates where he was subject to a search each time he entered and random drug and

alcohol tests, slept on a cot in a ten-by-ten room with two other people, and used common

showers.  The aspect of White's Work Release that is perhaps the most analogous to institutional

confinement was the requirement that White and the other inmates wear a "standard jail

uniform," consisting of a grey sweat suit and shoes without laces, while in the facility.  White

did not even have the freedom to choose his attire in the Center.  The uniform was just one

"incident of imprisonment" that White lived his life subject to, which, when combined with the

constant monitoring, the limited amount and strict restrictions on his time out of the Center, and

the searches he was subject to, illustrates the prison-like nature of his experience in Work

Release.  White was not released from institutional confinement like a pre-parolee, parolee, or probationer, *see Young*, 529 U.S. at 147; *Gagnon*, 411 U.S. at 782; *Morrissey*, 408 U.S. at 481, but rather was simply serving a portion of his confinement in a different location than prison, *Domka*, 523 F.3d at 781 n.3.  As such, White did not have a protected liberty interest in his continued participation in work release inherent in the Due Process Clause itself.

### b.  State-Created Liberty Interest Under the Due Process Clause

Even if a liberty interest does not arise from the Due Process Clause itself, under *Sandin*, a liberty interest may arise under the Due Process Clause from a state statute or regulation if the "conduct of the government official imposes an atypical hardship in relation to ordinary prison life."  *Paige*, 234 F. Supp. 2d at 901.  In the context of prisoners, courts have essentially limited these protected liberty interests to the loss of good time credits or placement for an indefinite period of time in a "supermax" prison.  *Hinton*, 2006 WL 3192381, at *3 (citations omitted).

When determining whether a state-created liberty interest exists, the inquiry under *Sandin* is objective rather than subjective.  *See Sandin*, 515 U.S. at 468 n.9 (noting that a prisoner's subjective expectation is not dispositive of the liberty interest analysis).  For example, in *Sandin*, the Supreme Court compared inmates inside and outside of disciplinary segregation in determining that placing a prisoner in disciplinary segregation for thirty days "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."  515 U.S. at 486.  Accordingly, in work release situations, the key question is not how removal from work release altered the prisoner's own daily experience, but rather whether the prisoner's removal was atypical or significant when compared to the experience of the large number of prisoners who spend the duration of their sentences in prison.  *Hinton*, 2006 WL

3192381, at *4; *accord Asquith*, 186 F.3d at 412 (noting that *Sandin* does not permit courts to compare the prisoner's own life before and after the alleged deprivation, but, instead, requires courts to compare the prisoner's liberties after the alleged deprivation with the normal incidents of prison life).

The rule of ordinary prison life is not participating in work release or home detention; it is remaining "either locked in the institution around the clock or under close supervision." *Hinton*, 2006 WL 3192381, at *4. Being confined within four walls in a higher security facility, even when coming from a minimum security work release facility, is an ordinary incident of prison life. *Id.* (quoting *Dominique*, 73 F.3d at 1160). While such a change from the quasi-freedom of work release to the regimentation of life within four walls may be a significant deprivation, it is not an atypical one when compared to the norm of prison life. *Dominique*, 73 F.3d at 1160. Therefore, using this analysis, courts have found that an inmate does not have a state-created liberty interest in a work release program. *Asquith*, 186 F.3d at 412; *Callender*, 88 F.3d at 669; *Dominique*, 73 F.3d at 11; *Hinton*, 2006 WL 3192381, at *4; *Weller*, 75 F. Supp. at 934.

In coming to this conclusion, the courts have also relied on the fact that the change in confinement did not affect the duration of the inmate's sentence. *Sandin*, 515 U.S. at 487; *Callender*, 88 F.3d at 669; *Dominique*, 73 F.3d at 1160; *Weller*, 75 F. Supp at 935. Moreover, if the inmate's participation in a work release program was not a court-ordered, guaranteed, or required aspect of his sentence, but rather subject to permission and approval, it is less likely that the inmate has a state-created liberty interest in his continued participation in that program. *See Hinton*, 2006 WL 3192381, at *4.

20

Here, White's removal from Work Release did not amount to transfer to a supermax prison or the actual loss of good time credits. *See Hinton*, 2006 WL 3192381, at *3. While White initially lost his good time credit, it was eventually restored to him. Therefore, the key inquiry is whether, objectively, White's removal from Work Release by the Steuben County Sheriff's Department imposed an atypical and significant hardship upon him as compared to the experience of the large number of prisoners who spend the duration of their sentences in prison. *Hinton*, 2006 WL 3192381, at *4; *accord Asquith*, 186 F.3d at 412. An inmate serving out his sentence in prison locked in confinement or under close supervision is the rule, or the ordinary incident of prison life; an inmate serving out his sentence in a work release or home detention program is the exception. *See Dominique*, 73 F.3d at 1160; *Hinton*, 2006 WL 3192381, at *4. Therefore, as White's removal from Work Release resulted in him being confined to jail, which is the norm for prisoners, it did not impose an atypical hardship upon him. While this may have been a significant hardship, it was not an atypical one such that it conceivably created a liberty interest. *See Dominique*, 73 F.3d at 1160.

Lending further support to the conclusion that White's removal from Work Release did not amount to an atypical and significant hardship is the fact that the duration of White's sentence was not affected by his removal, a factor courts have relied on in declining to find a state-created liberty interest. *See Sandin*, 515 U.S. at 487; *Callender*, 88 F.3d at 669; *Dominique*, 73 F.3d at 1160; *Weller*, 75 F. Supp at 935. As in *Hinton*, in which the court found that the inmate did not have a state-created liberty interest in work release, 2006 WL 3192381, at *4, White's participation in Work Release was not court-ordered, guaranteed, or required; instead, it was authorized by the trial court and subject to the approval and discretion of the

Steuben County Sheriff.  Therefore, White did not have a state-created liberty interest in his continued participation in Work Release such that he was entitled to due process before he was removed.

### 3.  *Qualified Immunity*

Qualified immunity shields "government actors from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware."  *Siliven v. Ind. Dep't of Child Serv.*, 635 F.3d 921, 925 (7th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  The doctrine protects public officials "who act in ways they reasonably believe to be lawful," leaving "ample room for mistaken judgments."  *Id.* (internal quotations omitted) (citations omitted).  The focus of the inquiry is on the objective legal reasonableness of the action, rather than the state of mind or good faith of the officials in question.  *Erwin v. Daley*, 92 F.3d 521, 525 (7th Cir. 1996).  In determining whether the officials are entitled to qualified immunity, courts employ a two part test: (1) whether the plaintiff's allegations make out a deprivation of a constitutional right, and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation.  *Siliven*, 635 F.3d at 925-26 (citing *Pearson*, 555 U.S. at 232).

When a defendant raises qualified immunity as a defense, the burden is on the plaintiff to show the existence of the allegedly clearly established constitutional right.  *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996).  The plaintiff can do so by showing either that there is a clearly analogous case decided before the defendant acted or failed to act that establishes the right to be free from the specific conduct at issue or that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights."  *Gonzalez v. City*

*of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (quoting *Smith v. City of Chi.*, 242 F.3d 737, 742 (7th Cir. 2001)).  For qualified immunity to be surrendered, preexisting law must dictate and truly compel the conclusion for every similarly situated, reasonable government agent that what he is doing violates federal law under the circumstances.  *Weller*, 75 F. Supp. 2d at 935 (quoting *Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1091 (7th Cir. 1997)).

As for the first prong—whether there was a deprivation of a constitutional right—in the two Northern of District Indiana cases considering qualified immunity in the context of work release programs, the court came out different ways.  In *Paige*, the court found that a probationer did have a liberty interest in his continued participation in a home detention program.  234 F. Supp. 2d at 902.  On the other hand, in *Weller*, the court found that a prisoner did not have a liberty interest in his continued participation in a work release program.  75 F. Supp. 2d at 935.  Despite these varying conclusions for the first prong, the court held that the defendants in both cases were entitled to qualified immunity because "it can hardly be said that the preexisting law dictated or truly compelled a conclusion that plaintiff possessed a liberty interest in continued participation in the home detention [and work release] program[s]."  *Paige*, 234 F. Supp. 2d at 903 (home detention); *Weller*, 75 F. Supp. 2d at 936 (work release).

In this case, even if White had a liberty interest in his continued participation in the work release program—which, as explained above, he does not—Defendants would still be entitled to qualified immunity because there were no closely analogous cases, decided before Defendants acted, that show a constitutional right was clearly established.  First, the Indiana case, *Million*, that White cites as entitling him to a due process hearing under Ind. Code § 35-38-2.6-5 is inapplicable to White's situation.  Furthermore, neither the Supreme Court nor the Seventh

23

Circuit has directly addressed the question of whether an inmate has a protected liberty interest in continued participation in a work release program.  Cases within the Seventh Circuit make it clear that inmates do not have a liberty interest in *initial* placement in a work release program. *See DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) (noting that prisoners do not possess liberty or property in their classification and prison assignments and that states may move their charges to any prison in the system, including low security institutions); *Cook v. Waldera*, No. 09-C-224, 2009 WL 1687680, at *2 (E.D. Wis. June 15, 2009) (holding that a Wisconsin prisoner serving a life sentence has no liberty or property interest in either his ability to participate in a work release program or his classification status); *Brewer v. Walker*, No. 08-cv-765-DRH, 2009 WL 1010434, at *2 (S.D. Ill. Apr. 14, 2009) (stating, that "it is well established that in the absence of a state rule creating a specific entitlement, prisoners have no liberty interest in placement").

The question becomes more difficult when an inmate who is already participating in a work release program is then removed from the program.  As *Paige* and *Weller* illustrate, whether a liberty interest exists depends upon the facts of the particular case, namely the nature and conditions of the confinement and the status of the plaintiff within the prison system. White's case fell somewhere between *Weller* and *Paige*, precluding either from being a clearly analogous case establishing White's right to be free from the specific conduct at issue. *Gonzalez*, 578 F.3d at 540; *see also Roy*, 2006 WL 2604606, at *1 (Northern District of Indiana case finding no liberty interest but with little analysis).  While the Seventh Circuit affirmed the *Paige* decision finding a liberty interest, because it dealt with a probationer as opposed to an inmate, it is not clearly analogous to White's case.  Other district courts within the Seventh

24

Circuit provide even more support for the conclusion that Defendants' conduct did *not* violate White's constitutional rights.  *See Hinton*, 2006 WL 3192381, at *4 (W.D. Wis. found no liberty interest); *Hamilton*, 919 F. Supp. at 1172 (N.D. Ill. found no liberty interest).  *But see Segreti v. Gillen*, 259 F. Supp. 2d 733, 738 (N.D. Ill. 2003) (holding that an inmate has a *statutory* liberty interest in participation in the work-release program under an Illinois statute).

If Defendants had looked outside the Seventh Circuit, they would have discovered a majority trend among the Courts of Appeals holding that an inmate does not have a liberty interest in continued participation in a work release program.  *Compare Asquith,* 186 F.3d at 411 (Third Circuit found no liberty interest), *Callender*, 88 F.3d at 668 (Eighth Circuit found no liberty interest), *Dominique*, 73 F.3d at 1161 (First Circuit found no liberty interest), *Bulger*, 65 F.3d at 50 (Fifth Circuit found no liberty interest), and *Whitehorn*, 758 F.2d at 1421 (Eleventh Circuit found no liberty interest), *with Anderson v. Recore*, 446 F.3d 324, 328-29 (2d Cir. 2006) (finding a liberty interest where inmate was not institutionalized), and *Edwards v. Lockhart*, 908 F.2d 299, 301-03 (8th Cir. 1990) (finding a liberty interest when plaintiff lived at home and not in an institution).  Thus, based on preexisting case law both within and outside the Seventh Circuit, the only reasonable conclusion is that Defendants' actions did not violate White's clearly established constitutional rights.

Additionally, nothing in the record suggests that Defendants' conduct was so egregious that no reasonable person could have believed that it would not violate clearly established rights.  *Gonzalez*, 578 F.3d at 540.  In disciplining White and removing him from Work Release, Defendants acted according to their rules and procedures and on their supported belief that White committed the alleged violations.  Consequently, because Defendants' conduct was not

egregious and "it can hardly be said that the preexisting law dictated or truly compelled a conclusion that [White] possessed a liberty interest in continued participation in the work release program," *Weller*, 75 F. Supp. 2d at 936, Defendants are entitled to qualified immunity.  Thus, the Court will GRANT Defendants' Motion for Summary Judgment on White's § 1983 claims.

## B.  Indiana Tort Claims Act

Along with his § 1983 claims, White also alleges violations under the Indiana Tort Claims Act ("ITCA").[15]  Although the ITCA does not apply to § 1983 actions, the ITCA is applicable to pendent state claims made within a § 1983 suit.  *Alexander v. City of South Bend*, 256 F. Supp. 2d 865, 875 (N.D. Ind. 2003).  Specifically, White asserts that Defendants violated his right to a due process hearing before his removal from Work Release under Ind. Code § 35-38-2.6-5 and *Million v. State*, falsely imprisoned him, and intentionally inflicted emotional distress on him.  (*See* White Dep. Ex. I; Compl. Counts III-IV.)  As concluded above, Ind. Code § 35-38-2.6-5 and *Million* do not apply to White's situation.  Therefore, the Court will consider only White's claims of false imprisonment and intentional infliction of emotional distress.

### 1.  Timely Filing of Notice of Indiana Tort Claims

Under the ITCA, a claim against a political subdivision is barred unless notice is filed within 180 days after the loss occurs.  IND. CODE § 34-13-3-8.  The head of a political subdivision, like a sheriff, must be given notice within 180 days as well.  *See Teague v. Boone*, 442 N.E.2d 1119, 1120 (Ind. Ct. App. 1982).  Compliance with the ITCA's notice provisions is not a statute of limitations, but rather a "conditional precedent to filing suit" and a "procedural precedent which the plaintiff must prove and which the trial court must determine before trial."

---

[15]This Court can exercise supplemental jurisdiction over these claims under 28 U.S.C. § 1367.

*Davidson v. Perron*, 716 N.E.2d 29, 34 (Ind. Ct. App. 1999). If the defendant raises failure to comply with the ITCA's notice requirements as an affirmative defense, the burden then shifts to the plaintiff to prove its compliance. *Id.*; *Wright v. Elston*, 701 N.E.2d 1227, 1233 (Ind. Ct. App. 1998). If a plaintiff fails to serve notice within 180 days of his loss, "the suit is barred and entry of summary judgment on behalf of the defendant is appropriate." *Wright*, 701 N.E.2d at 1233. In constructing the notice requirements, Indiana courts have drawn a distinction between the substance of the notice given and its timeliness. While the notice statute is to be liberally construed as to whether the notice is sufficiently definite as to the time, place, and nature of the injury, it is to be strictly construed as to giving timely notice to the proper officers. *Daugherty v. Dearborn Cnty.*, 827 N.E.2d 34, 36 (Ind. Ct. App. 2005) (citations omitted). Therefore, a substantial compliance doctrine has developed in construing the sufficiency of the notice that has not been expanded to the timely filing requirement. *See Boushery v. City of Indianapolis*, 931 N.E.2d 892, 895 (Ind. Ct. App. 2010) (noting that a notice will generally substantially comply with the ITCA if, among other things, it was filed within the required time period).

At the same time, the statutory period will be tolled in certain situations. First, under the statute itself, the 180-day notice period is tolled if a person is incapacitated and cannot give notice as required. IND. CODE § 34-13-3-9; *Fox v. Rice*, 936 N.E. 2d 316, 321-22 (Ind. Ct. App. 2010); *Davidson*, 716 N.E.2d at 34. Moreover, two doctrines—continuing wrong and fraudulent concealment—have also developed that can toll the statutory period. *See, e.g.*, *Johnson v. Blackwell*, 885 N.E.2d 25, 31-32 (Ind. Ct. App. 2008). The continuing wrong doctrine applies where an entire course of conduct combines to produce an injury and requires the plaintiff to demonstrate that the alleged injury-producing conduct was of a continuous nature. *Id.* at 31. If

27

this doctrine applies, the statutory period begins to run at the end of the continuing wrongful act. *Id.* The doctrine will not prevent the time from running, however, when the plaintiff learns of facts that should lead to the discovery of his cause of action. *Id.* Furthermore, the fraudulent concealment doctrine, found in Ind. Code § 34-11-5-1, provides that "[i]f a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action." IND. CODE § 34-11-5-1; *Johnson*, 885 N.E.2d at 32.

Because of the preclusive effect of failing to file a timely notice, when the 180-day period begins to run is very important. The statute states that notice must be filed "with 180 days *after the loss occurs*," IND. CODE § 34-13-3-8 (emphasis added), indicating that the date of the loss would be determinative. Loss is defined as "injury to or death of a person or damage to property." IND. CODE § 34-6-2-75(a). Recently, the United States Supreme Court held that for false imprisonment (and false arrest) claims the period of limitations begins to run when the alleged imprisonment becomes no longer "false." *Wallace v. Kato*, 549 U.S. 384, 389 (2007); *Fox*, 936 N.E.2d at 322. Specifically, the Court stated, "a false imprisonment ends once the victim becomes held *pursuant to [legal] process*—when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 389 (emphasis in original). Applying *Wallace*, the Indiana Court of Appeals held in *Johnson*, 885 N.E.2d at 31, that the plaintiff's cause of action for false imprisonment accrued when he was bound over for trial rather then when he was initially arrested, and in *Fox*, 936 N.E.2d at 322, that the false imprisonment claim accrued when the plaintiff was served with an arrest warrant. On the other hand, the court found that the *Johnson* plaintiff's cause of action for intentional infliction of emotional distress arising

28

from a search of his home and his subsequent arrest accrued on the day that the search and his

arrest occurred.  885 N.E.2d at 31.  Thus, while a false imprisonment cause of action accrues on

the date the plaintiff is held pursuant to legal process, a cause of action for other violations such

as intentional infliction of emotional distress accrues on the date the alleged loss occurred.

Here, White alleges that his causes of action for both false imprisonment and intentional

infliction of emotional distress accrued on February 22, 2009, when he returned to Work

Release.[16]  (Pl.'s Resp. 23.)  Defendants assert that these claims accrued on January 22, 2009,

when White was transferred from Work Release to jail without a hearing.  (Defs.' Mem. in Supp.

of Mot. for Summ. J. 13.)  White submitted his Notice of Tort Claim on August 14, 2009.

(White Dep. Ex. I.)  Therefore, if Defendants are correct, White filed the notice after 180 days

had passed, barring his claims and entitling Defendants to summary judgment.  *See Wright*, 701

N.E.2d at 1233.  On the other hand, if White's assertions are right, then his notice would have

been timely, requiring the court to reach the merits of his claims.  Because causes of action for

false imprisonment and for intentional infliction of emotional distress have different accrual

dates, *see, e.g.*, *Johnson*, 885 N.E.2d at 31, the Court must look at each claim independently.

First, under the Supreme Court's holding in *Wallace*, White's claim of false

imprisonment accrued when he became held pursuant to legal process.  White's situation,

however, presents a situation unique from those in *Johnson* and *Fox*.  White was not arrested,

arraigned, or bound over for trial; he simply moved from one institutional facility to another

while serving his sentence.  The closest thing to "legal process" that White experienced was the

---

[16]According to White's deposition, he returned to Work Release on February 18, 2009.  (White Dep. 47.)
However, this discrepancy does not affect the analysis because even if that earlier date is used, the Notice would
have been filed within 180 days of White's asserted accrual date.

disciplinary interview with Officers Adam Kitson and Dan Brown on January 26, 2009, from which the officers determined that White was guilty of the alleged violations. (White Dep. 38-40, Ex. G.) At this point, White would have been held in the Jail pursuant to "legal process," and his false imprisonment cause of action would have began to run. As such, his filing of the notice on August 14, 2009, would have been outside the 180-day statutory period, thereby barring his false imprisonment claim. While White could have made tolling arguments in his response on the basis of continuing wrong, fraudulent concealment, or incapacitation, he does not do so and, thus, fails to bear his burden of proving compliance with the ITCA. Nonetheless, because the Court will ultimately find that White's false imprisonment claim lacks merit, the actual accrual date is not dispositive.

As for White's intentional infliction of emotional distress claim, as illustrated in *Johnson*, that claim would accrue when the loss occurred. *See Johnson*, 885 N.E.2d at 31. Here, the loss, defined as "injury to or death of a person or damage to property," IND. CODE § 34-6-2-75(a), arguably occurred when White was removed from Work Release and transferred to the Jail on January 22, 2009. Although White's complaint alleges that Defendants "intentionally and deliberately inflicted severe emotional distress on White by maliciously confining him in the Steuben County, Indiana, Jail for several weeks without due process of law" (Compl. ¶ 38), he makes no argument that this amounted to a continuing wrong situation that would toll the statutory period under the ITCA. *See Johnson*, 885 N.E.2d at 31. Rather, White simply argues that he "exercised due diligence and filed his claim within 180 days of his return to Work Release on February 22, 2009." (Pl.'s Resp. 23.) Once again, proving compliance with the notice requirements of the ITCA is White's burden to bear, and he has not done so here.

30

Nevertheless, like with White's false imprisonment claim, because the Court will ultimately

determine that White's intentional infliction of emotional distress claim lacks merit, the actual

accrual date is irrelevant.[17]

### 2. False Imprisonment

Under Indiana law, false imprisonment is defined as "an unlawful restraint upon one's

freedom of locomotion or the deprivation of liberty of another without his consent." *Wilson*,

2010 WL 742479, at *6 (quoting *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 967 (Ind.

Ct. App. 2001)).  A plaintiff may establish an Indiana false imprisonment claim where his

freedom of movement was limited or restrained in some way without probable cause. *Bentz v.

City of Kendallville*, 577 F.3d 776, 780 (7th Cir. 2009).  This probable cause analysis is most

appropriate in cases in which the claim of false imprisonment arises directly from an arrest or

detainment. *See, e.g.*, *id.*; *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104-05 (Ind. Ct. App.

2002).  In cases where the plaintiff is already confined or imprisoned when the alleged false

imprisonment occurs, courts have found that claims of false imprisonment resulting from

accusations that the plaintiff violated institutional rules or punishments for such violations lack

merit. *Parks v. Dooley*, No. 09-3514, 2011 WL 847011, at *32 (D. Minn. Feb. 11, 2011)

---

[17]Moreover, while Defendants have not raised immunity as a defense, it is likely that they would be entitled to such on White's intentional infliction of emotional distress claim under Ind. Code § 34-13-3-3(8).  Under that provision, governmental employees acting within the scope of their employment are immune from liability if a loss results from "[t]he adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment." IND. CODE § 34-13-3-3(8); *Wilson v. Grable*, No. 1:08-cv-660-RLY-TAB, 2010 WL 742479, at *6 (S.D. Ind. Mar. 2, 2010).  Thus, while Defendants would not be immune to liability from White's false imprisonment claim, they could be immune with respect to his intentional infliction of emotional distress claim.  To receive immunity for White's intentional infliction of emotional distress claim, Defendants must have been "engaged in the enforcement of law" and "act[ing] within the scope of employment" when the alleged loss occurred. *Hendricks v. New Albany Police Dep't*, 749 F. Supp. 2d 863, 873 (S.D. Ind. 2010).  As Defendants do not assert this immunity defense and because White's intentional infliction of emotional distress claim will fail on the merits, the Court need not reach immunity. *Wilson*, 2010 WL 742479, at *6.

(finding that although a prisoner charged with violations of prisons rules was subsequently placed in segregation, segregation did not amount to false imprisonment, "particularly where [plaintiff] was already lawfully confined in prison"); *Wells v. S.C. Dep't of Prob. & Parole*, No. 4:06-1965-HFF-TER, 2007 WL 904283, at *8 (D.S.C. Mar. 22, 2007) (concluding that where the petitioner violated terms of a community supervision program on several occasions and consequently had his home detention revoked, his false imprisonment claim was without merit because he was detained by lawful authority); *Branch v. Shank*, No. 3:06-CV-339 RM, 2006 WL 3513797, at *2 (N.D. Ind. Dec. 5, 2006) (holding that because plaintiff on work release was already imprisoned as a convicted felon when he was accused of escape, "he was not falsely imprisoned, or even imprisoned at all, as a result of [the] accusations").

In the instant case, White's false imprisonment claim is entirely without merit. As the Northern District of Indiana stated in *Branch*, White was not "falsely imprisoned, or even imprisoned at all," 2006 WL 3513797, at *2, as the result of his removal from Work Release because White was already imprisoned when he was removed from Work Release and transferred to Jail. Moreover, White's transfer was nothing but a change in the location of his confinement. White's transfer to Jail could not amount to false imprisonment because he was already lawfully confined in an prison-like institution, albeit one of lower security. *See Parks*, 2011 WL 847011, at *32. Even if it were possible for an inmate like White to be falsely imprisoned upon a transfer to another facility, in removing White from Work Release, Defendants did not act unlawfully, but rather pursuant to the established procedures and regulations of Work Release. Consequently, the Court will GRANT Defendants' Motion for Summary Judgment on White's false imprisonment claim under the ITCA.

32

### *3.  Intentional Infliction of Emotional Distress*

Finally, White contends that Defendants intentionally inflicted emotional distress on him. Under Indiana law, to make out an intentional infliction of emotional distress claim, the plaintiff must show that the defendant intentionally or recklessly caused him severe emotional distress by extreme and outrageous conduct.  *Morgan v. Snider High Sch.*, No. 1:06-cv-337, 2007 WL 3124524, at *13 (N.D. Ind. 2007) (citing *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)). The standard is a rigorous one, and Indiana courts require some showing by the plaintiff that the alleged conduct "exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind."  *Id.* (quoting *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 957 (S.D. Ind. 2007)).  The alleged conduct must be regarded as "atrocious and utterly intolerable in a civilized community"; accordingly, mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not impose liability.  *Ott v. Edinburgh Cmty. Sch. Corp.*, No. 1:30-CV-1413, 2005 WL 2886212, at *6 (S.D. Ind. Oct. 31, 2005), *aff'd*, 189 F. App'x 507 (7th Cir. 2006).

Here, White has failed to identify any conduct in the record that even comes close to the outrageousness or indecency required to make out an intentional infliction of emotional distress claim.  All White asserts is that "[s]hould White prevail on his constitutional claims, particularly when it is alleged the Sheriff's Office had an established policy of denial of due process hearings in a court of law, and violated the express terms of Judge Fee's order," he will establish a cause of action for intentional infliction of emotional distress.  (Pl.'s Resp. 24.)  First, as shown above, the Sheriff's Office was not subject to Ind. Code § 35-38-2.6-5 in running its work release program or required to give the procedural protections declared in *Million* because Work

33

Release, as it existed in Steuben County, was not a community corrections program.  Moreover, White has misinterpreted Judge Fee's order, which required a hearing only before the execution of any remaining suspended sentence or revocation of any continuing probation.  (White Dep. Ex. A, at ¶ 6.)  White, however, was serving the executed portion of his sentence when he was removed from Work Release so Judge Fee's order is inapplicable to him.  Thus, as Defendants' actions did not violate the law, but were instead established procedures inside Work Release for dealing with alleged disciplinary violations, it can hardly be said that their actions "exceed[ed] all bounds usually tolerated by a decent society."  *Morgan*, 2007 WL 3124524, at *13.

Furthermore, White has also failed to offer evidence that would support even a reasonable inference that Defendants intended to inflict emotional distress on him.  *Id.* (granting summary judgment when the plaintiff failed to present evidence to support a reasonable inference that any of the defendants intended to inflict emotional distress on the plaintiff).  Consequently, the Court will GRANT Defendants' Motion for Summary Judgment on White's intentional infliction of emotional distress claim under the ITCA.

## V.  CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' Motion for Summary Judgment (Docket # 22) and DIRECTS the Clerk to enter judgment in favor of Defendants and against Plaintiff White.

SO ORDERED.

Entered this 27th day of September, 2011.

/s/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge